**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. 25-42-02** |
| **TAUHEED TUCKER** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

For nine months, Tauheed Tucker was an integral member of a long-running conspiracy responsible for stealing thousands of U.S. Treasury checks from a U.S. Postal Service mail processing center in Philadelphia and then reselling those stolen checks online to purchasers across the country, who fraudulently cashed them. These crucial government benefit payments were diverted from thousands of innocent intended recipients, and the U.S. government ultimately paid out approximately $11 million of taxpayer money to undeserving fraudsters. After being recruited by his cousin, co-defendant Saahir Irby, Tucker—a Postal employee with unfettered access to the vast quantities of Treasury checks passing through the mail processing center where he worked—stole those checks while on duty, abusing the sensitive access and the public trust that his position as a Postal employee afforded him. Tucker and Irby, the two Postal employees involved in the conspiracy, sold their inventory of stolen Treasury checks to two additional co-conspirators, Cory Scott and Alexander Telewoda, who resold them to purchasers across the country. Tucker has been tied to stolen Treasury checks with an aggregate face value totaling more than $61 million. For the reasons set forth below, the government respectfully requests that the Court impose a sentence at the low end of the advisory sentencing guideline range of 51 to 63 months, absent any reason for departure addressed in the supplemental sealed attachment to this sentencing memorandum.

## I. PROCEDURAL BACKGROUND

On May 28, 2025, Tucker was charged along with three co-defendants in a four-count superseding indictment, arising from Tucker's participation in a scheme to steal thousands of U.S. Treasury checks from a U.S. Postal Service mail processing center and then resell and ship those stolen checks throughout the country to purchasers who ultimately negotiated the stolen checks at financial institutions. Tucker was charged with three counts: conspiracy to steal government funds, in violation of 18 U.S.C. § 371 (Count One); theft of government funds, and aiding and abetting, in violation of 18 U.S.C. §§ 641 and 2 (Count Two); and mail theft, and aiding and abetting, in violation of 18 U.S.C. §§ 1708 and 2 (Count Three). On April 30, 2026, Tucker pled guilty to all three counts, pursuant to a plea agreement with the government. The Court has scheduled a sentencing hearing for October 19, 2026, at 2:00 p.m.

## II. FACTUAL BACKGROUND

The United States Department of the Treasury, Bureau of the Fiscal Service ("BFS"), is responsible for printing and mailing U.S. Treasury checks to individuals and businesses throughout the United States.[1] Treasury checks that are mailed out by BFS but are undeliverable to the intended recipient for any reason are marked "Return to Sender" and sent back to a BFS facility located in Philadelphia via the U.S. Postal Service ("USPS"). Treasury checks mailed from, or returned to, BFS's Philadelphia facility are processed at a USPS mail processing center in Philadelphia. Tauheed Tucker worked as a Mail Processing Clerk at the processing center from November 2022 to September 2024. Tucker's cousin, co-defendant Saahir Irby, also

---

[1] These Treasury checks represent payments from a large number of federal agencies and include, among many other payments, income tax refunds from the Internal Revenue Service, social security benefit payments from the Social Security Administration, and veterans benefit payments from the Department of Veterans Affairs.

worked as a Mail Processing Clerk at the processing center during that time period. In those roles, Tucker and Irby sorted mail passing through the facility and had physical access to mail sorting machines that processed mail sent from and addressed to BFS's Philadelphia facility.

Starting by June 2023, Irby and co-defendants Cory Scott and Alexander Telewoda conspired to steal Treasury checks from the Philadelphia mail processing center and then resell those checks via the instant messaging application Telegram to purchasers around the country. To facilitate the scheme, Irby identified mail sorting machines which, at certain times of the day, processed large numbers of envelopes containing Treasury checks that had been marked "Return to Sender" and were being returned to BFS's Philadelphia facility. Irby began stealing those sealed envelopes in large quantities and delivering them to Scott and Telewoda, who then advertised the stolen checks on Telegram, sold them to other Telegram users (typically for 10% of their face value), and mailed the checks to those purchasers who then attempted to negotiate the stolen checks at financial institutions.

On August 8, 2023, Irby and Scott exchanged messages via Telegram discussing how to get Tucker (Irby's cousin) involved in the Treasury check theft scheme. In the days that followed, Tucker and Irby exchanged Telegram messages discussing how to steal checks from certain mail processing machines within the Philadelphia mail processing center.

While other USPS employees responsible for manning those specific machines stepped away from the machines on break, Tucker and Irby would approach the sorting machines and remove large numbers of envelopes containing Treasury checks from the mail bins to which those envelopes had been sorted. Without opening the envelopes, they concealed the envelopes in a sweatshirt or jacket pocket, or in a backpack, and left the area. On numerous occasions between August 2023 and May 2024, Tucker stole bulk quantities of envelopes containing

Treasury checks—which were then provided to Scott and Telewoda who advertised the checks for resale on their respective Telegram channels—while he was on duty at the Philadelphia mail processing center.

Tucker and Irby were terminated by USPS on or about September 11, 2024, thereby eliminating their access to Treasury checks passing through the mail processing center. In total, Scott and Telewoda paid Tucker at least $28,200 for his participation in the scheme. The total face value of Treasury checks tied to the conspiracy exceeded $84 million, more than $61 million of which were stolen and/or advertised for sale during Tucker's participation in the scheme. Scott's and Telewoda's purchasers attempted to fraudulently cash thousands of those Treasury checks at financial institutions, and the government ultimately paid out approximately $11 million to those individuals (approximately $2.6 million of that total involved checks tied to Tucker), which it was unable to recover.

## III. SENTENCING CALCULATION

### A. Statutory Maximum Sentences

The statutory maximum penalty for Count One, charging conspiracy to steal government funds, is a term of imprisonment of 5 years, a term of supervised release of 3 years, a fine of $250,000, and a special assessment of $100; for Count Two, charging theft of government funds (and aiding and abetting), a term of imprisonment of 10 years, a term of supervised release of 3 years, a fine of $250,000, and a special assessment of $100; and for Count Three, charging mail theft (and aiding and abetting), a term of imprisonment of 5 years, a term of supervised release of 3 years, a fine of $250,000, and a special assessment of $100.

Thus, the total permissible statutory maximum sentence is a term of imprisonment of 20 years, a term of supervised release of 3 years, a fine of $750,000, and a special assessment of

$300. Full restitution of as much as $2,628,984.39 shall be ordered, and forfeiture of $28,200 also may be ordered.

### B. Sentencing Guidelines Calculation

The U.S. Probation Office has concluded that Tucker's total advisory guideline range is 51 to 63 months' imprisonment, given an offense level of 24 and a criminal history category of I. *See* Presentence Investigation Report ("PSR") ¶ 87. The government agrees with this calculation, and the defense has not submitted any objections.

#### 1. Offense Level Calculation

The Probation Office has correctly calculated Tucker's offense level as follows:

| | |
|---|---|
| Base offense level (§ 2B1.1(a)(2)) | 6 |
| Intended loss between $25 million and $65 million (§ 2X1.1(a), § 2B1.1(b)(1)(L)) | +22 |
| Offense involved 10 or more victims (§ 2B1.1(b)(2)(A)) | +2 |
| Reduction for conspiracy (§ 2X1.1(b)(2)) | -3 |
| Abuse of position of trust (§ 3B1.3) | +2 |
| Zero-Point Offender (§ 4C1.1) | -2 |
| Timely acceptance of responsibility (§ 3E1.1(a), (b)) | -3 |
| **Total:** | **24** |

PSR ¶¶ 36–45.

2. Criminal History Calculation

Tucker has no criminal history, which results in a criminal history score of zero. PSR ¶ 48. With no criminal history points, Tucker is in criminal history category I. *Id.* As noted above, Tucker also received a reduction of two offense levels given his lack of prior convictions. *Id.* ¶ 42.

Given a total offense level of 24 and a criminal history category of I, Tucker's guideline range is 51 to 63 months' incarceration. *Id.* ¶ 87.

## IV. ANALYSIS OF STATUTORY FACTORS

The Supreme Court has declared that "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). This Court must also consider all of the sentencing factors set forth in 18 U.S.C. § 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a). For the reasons set forth below, the government submits that a sentence at the low end of the 51-to-63 month advisory guideline range is fully supported by each of the § 3553(a) factors.

### A. The Nature and Circumstances of the Offense

Tucker's offenses were very serious. He played an integral role in a long-running conspiracy to steal thousands of U.S. Treasury checks—worth tens of millions of dollars—from a USPS facility and resell them to opportunists ready to try their luck cashing in on government payments intended for others. Tucker was one of only two individuals who made this crime possible: without Tucker's and Irby's access to Treasury checks passing through the mail processing center—a secure facility accessible only to Postal employees—this crime could not have occurred. Their participation was so critical to the success of the scheme that the conspiracy crumbled when Tucker and Irby were fired from USPS because their termination deprived co-conspirators Scott and Telewoda of their unlimited supply of stolen checks. Importantly though, Irby joined the scheme first and later recruited Tucker into it. The government also gathered no evidence of Tucker continuing to steal Treasury checks after May 2024, while Irby continued to steal checks and resell them to Scott and Telewoda through at least August of that year.

Nevertheless, the total face value of the checks stolen during Tucker's participation in the conspiracy is staggering: Tucker has been tied to more than $61 million in intended loss. Although not all of these checks were negotiated at banks, each and every one of them was stolen from the mail by Tucker or Irby, resold by Tucker or Irby to a co-conspirator, and—most importantly—diverted from its true intended recipient.

As a result of the defendants' conduct, thousands of individuals who were counting on government payments were left empty-handed for months or even years. These victims are hardworking Americans who, in many cases, desperately needed these government funds. Many of the stolen Treasury checks represented social security and veterans benefit payments, as well as income tax refunds—payments on which ordinary individuals rely to meet their daily living

expenses. In other cases, the stolen Treasury checks represented substantial payments designed to help businesses stay afloat and keep employees on their payroll during the COVID-19 pandemic. In one instance, Tucker and his co-conspirators stole three checks totaling more than $400,000 from a single victim. PSR ¶ 25 (victim J.B.).

Although victims could contact the government to request that their missing checks be reissued, that was not a straightforward process, especially where their checks had already been fraudulently cashed by an impersonator. As several victims explained to the Probation Office, the process of having their stolen checks reissued was a lengthy and arduous one. One victim reported waiting two years for a replacement check. *Id.* ¶ 28 (victim S.C.). Where businesses and individuals were counting on large payments that didn't arrive as expected, some even had to take out high-interest loans or delay payment of other expenses while waiting for replacement checks. *Id.* ¶¶ 25 (victim S.C. was unable to timely pay off a line of credit); 30 (victim J.B. remortgaged his home to keep his business operating when his pandemic relief payments did not arrive as scheduled). In some cases, victims are still waiting for their checks to be reissued. *Id.* ¶ 25 (victim D.N.). These victims reported being "embarrassed by the situation," *id.* ¶ 27, suffering "fear, stress, anxiety, frustration, and uncertainty," *id.* ¶ 30, and losing all faith in the U.S. postal system, *id.* ¶ 27.

Beyond the individuals who personally suffered at the hands of Tucker and his co-conspirators, the government was deceived into paying out nearly $11 million in taxpayer funds ($2.6 million of which Tucker is responsible for) to undeserving fraudsters as a result of the defendants' crimes. Ultimately, crimes like Tucker's undermine public confidence in the reliability and smooth operation of government programs generally, and in the integrity and dependability of the U.S. mail specifically. Tucker's abuse of the trusted access that he had to

these Treasury checks made a mockery of the U.S. postal system. Given the brazenness of these crimes and the sheer number of stolen checks involved, a sentence of incarceration at the low end of the guideline range is fully justified here.

**B. The History and Characteristics of the Defendant**

Tucker's personal history also supports a sentence of imprisonment at the low end of the guideline range. While Tucker has no criminal history, that fact is already accounted for in both his offense level and criminal history category calculation, thereby lowering his applicable sentencing guideline range. PSR ¶¶ 42, 48.

Tucker appears to have made a greater effort than his co-defendants to be a productive member of society over the past several years, which counsels in favor of a sentence at the low end of the guideline range. He has had a relatively consistent employment history, *id.* ¶¶ 75-79, though—like his cousin, Saahir Irby—his most stable job was working for USPS, *id.* ¶ 77, during which time he routinely stole from his employer, leading to the instant charges. Tucker also admitted to using marijuana daily until his arrest in this case, *id.* ¶ 68, and having had a gambling problem, *id.* ¶¶ 65-66.

**C. The Need for Adequate Deterrence**

In fashioning the appropriate sentence, the Court should account for both specific and general deterrence. As to specific deterrence, a sentence at the low end of the guideline range—which is necessary in light of the seriousness of Tucker's crimes—should be sufficient to deter him from the commission of further offenses. This will be Tucker's first sentence of imprisonment and should effectively send a message that high-dollar financial crimes will be met with the most serious of consequences.

General deterrence is also particularly important in this case. Fraud schemes utilizing checks stolen from the mail are a widespread and dire problem not only in the Eastern District of Pennsylvania, but throughout the country. The misconduct has resulted in a loss of trust in the Postal Service and has even led to guidance that Americans should no longer send checks through the mail due to the serious risk of check fraud. *See, e.g.*, Ann Carrns, *Don't Send Checks Through the Mail. Just Don't*, N.Y. Times (June 26, 2026), https://www.nytimes.com/2026/06/26/your-money/paper-checks-mail-fraud.html (comment by the director of financial services for the Consumer Federation of America that "[n]o one should ever mail a check"). Thus, a significant sentence is critical in this case to send a message that this conduct will not be tolerated.

**D. The Need to Avoid Unwarranted Sentencing Disparities**

Four defendants have been charged in connection with this scheme, and it is therefore imperative that Tucker be sentenced in accordance with his relative culpability. Alexander Telewoda has been sentenced to a term of 78 months' incarceration—in the middle of his advisory guideline range of 70 to 87 months. Cory Scott and Saahir Irby each face a guideline range of 63 to 78 months and the government is recommending a sentence of 70 months' incarceration for both defendants.

Tucker's guidelines are appropriately lower than those of his co-defendants, driven by the fact that Tucker joined the conspiracy after its formation and ostensibly stopped stealing checks before he and Irby were fired by USPS, resulting in Tucker being held responsible for a lower intended loss amount ($61 million versus $84 million) pertaining only to the time in which he was an active participant in the scheme. The government is recommending a sentence at the low end of Tucker's guideline range—as opposed to the middle of that range, which was the

government's recommendation for all three of Tucker's co-defendants—to fully account for the fact that Tucker is measurably less culpable than his co-defendants.

As one of only two Postal employees who participated in the conspiracy, Tucker played an integral role in the scheme, and therefore is not entitled to an offense level reduction under U.S.S.G. § 3B1.2 for minor or minimal participants. Tucker was an active participant for nine months, the majority of the conspiracy's duration. During that time, he stole Treasury checks from the Philadelphia mail processing center in exactly the same manner as Irby did. More than $61 million in Treasury checks were stolen during Tucker's tenure. But, given that Tucker was recruited into the scheme by Irby and earned less than half of what Irby made from the scheme ($28,000 versus $75,000), a sentence at the low end of Tucker's guideline range would appropriately reflect his relative culpability and avoid any unwarranted sentencing disparities among co-defendants.

## V. <u>RESTITUTION</u>

The government respectfully requests that the Court order Tucker to pay restitution in the amount of $2,628,984.39, joint and several with his co-defendants, which represents the total losses to government agencies that honored checks fraudulently cashed by Scott's and Telewoda's purchasers that were stolen during Tucker's participation in the scheme.

## VI. <u>SUPERVISED RELEASE</u>

Pursuant to Sections 5D1.1 and 5D1.2 of the Sentencing Guidelines, as amended effective November 1, 2025, the Court is directed to conduct an "individualized assessment" when deciding whether to impose a term of supervised release, and if supervised release is imposed, how long the term should be. The Court is further directed to state in open court its reasons for imposing or not imposing a term of supervised release, and its reasons for the length

of a term imposed. Further, § 5D1.3 sets forth mandatory conditions of a term of supervised release, and "discretionary conditions" that the Court may impose, following the same individualized assessment.

The guideline commentary, consistent with 18 U.S.C. § 3583(c), provides that the "individualized assessment" should rest on consideration of the same sentencing factors under 18 U.S.C. § 3553(a) that are considered with respect to a term of imprisonment, with the exception of §§ 3553(a)(2)(A) (the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense") and 3553(a)(3) ("the kinds of sentences available"), which do not apply with regard to supervised release decisions.

In this case, a term of supervised release of three years is warranted. Given Tucker's history of gambling and substance use, PSR ¶¶ 66-68, close supervision following his release from imprisonment is warranted to ensure that he receives and follows through with the appropriate treatment for those issues, pursuant to § 3553(a)(2)(D). Supervision is also essential to ensure that Tucker makes payments toward his $2.6 million restitution obligation upon his release from custody, in accordance with § 3553(a)(7).

## VII. CONCLUSION

For the reasons set forth above, subject to any representations in the Sealed Supplement, the government respectfully requests that the Court impose a sentence of incarceration at the low end of the 51-to-63 month guideline range, as well as a three-year period of supervised release. The government further requests that Tucker be required to pay restitution, joint and several with his co-defendants, in the amount of $2,628,984.39.

Respectfully submitted,

DAVID METCALF
United States Attorney

*/s/ Jessica Rice*
JESSICA RICE
Assistant United States Attorney

Dated: October 9, 2026

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the Government's Sentencing Memorandum has been served by electronic filing (ECF) upon the following:

Thomas Fitzpatrick
Tom@minceyfitzross.com
*Counsel for Defendant Tauheed Tucker*

*/s/Jessica Rice*
JESSICA RICE
Assistant United States Attorney

Dated: October 9, 2026