**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. 25-42-01** |
| **SAAHIR IRBY** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

For 15 months, Saahir Irby was an indispensable member of a conspiracy responsible for stealing thousands of U.S. Treasury checks from a U.S. Postal Service mail processing center in Philadelphia and then reselling those stolen checks online to purchasers across the country, who fraudulently cashed them. These crucial government benefit payments were diverted from thousands of innocent intended recipients, and the U.S. government ultimately paid out approximately $11 million of taxpayer money to undeserving fraudsters. Irby—a Postal employee with unfettered access to the vast quantities of Treasury checks passing through the mail processing center where he worked—stole those checks while on duty, abusing the sensitive access and the public trust that his position as a Postal employee afforded him. Irby was the first, and most active, Postal employee involved in the conspiracy. He recruited his own cousin, a fellow Postal employee, into the conspiracy and the two of them sold most of their inventory of stolen Treasury checks to two additional co-conspirators who resold them to purchasers across the country. But these co-conspirators weren't Irby's only customers. He has also pleaded guilty to selling checks to another buyer in August 2024.

By the time of his arrest in September 2024, Irby had been tied to stolen Treasury checks with an aggregate face value totaling more than $84 million. For the reasons set forth below, and in accordance with the terms of the plea agreement between the parties, the government

respectfully requests that the Court impose a sentence of 70 months' incarceration, absent any reason for departure addressed in the supplemental sealed attachment to this sentencing memorandum.

## I. **PROCEDURAL BACKGROUND**

On May 28, 2025, defendant Saahir Irby was charged along with three co-defendants in a four-count superseding indictment, arising from Irby's participation in a scheme to steal thousands of U.S. Treasury checks from a United States Postal Service mail processing center and then resell and ship those stolen checks throughout the country to purchasers who ultimately negotiated the stolen checks at financial institutions. Irby was charged with all four counts: conspiracy to steal government funds, in violation of 18 U.S.C. § 371 (Count One); theft of government funds, and aiding and abetting, in violation of 18 U.S.C. §§ 641 and 2 (Count Two); mail theft, and aiding and abetting, in violation of 18 U.S.C. §§ 1708 and 2 (Count Three); and mail theft, in violation of 18 U.S.C. § 1708 (Count Four).[1] On May 5, 2026, Irby pled guilty to all four counts, pursuant to a plea agreement governed by Federal Rule of Criminal Procedure 11(c)(1)(C). The Court has scheduled a sentencing hearing for October 19, 2026, at 10:00 a.m.

## II. **FACTUAL BACKGROUND**

The United States Department of the Treasury, Bureau of the Fiscal Service ("BFS"), is responsible for printing and mailing U.S. Treasury checks to individuals and businesses throughout the United States.[2] Treasury checks that are mailed out by BFS but are undeliverable

[1] Irby was originally charged on February 5, 2025 in a single-count indictment that subsequently became Count Four of the superseding indictment.

[2] These Treasury checks represent payments from a large number of federal agencies and include, among many other payments, income tax refunds from the Internal Revenue Service, social security benefit payments from the Social Security Administration, and veterans benefit payments from the Department of Veterans Affairs.

to the intended recipient for any reason are marked "Return to Sender" and sent back to a BFS facility located in Philadelphia via the U.S. Postal Service ("USPS"). Treasury checks mailed from, or returned to, BFS's Philadelphia facility are processed at a USPS mail processing center in Philadelphia. Saahir Irby worked as a Mail Processing Clerk at the processing center from October 2022 to September 2024. In that role, Irby sorted mail passing through the facility and had physical access to mail sorting machines that processed mail sent from and addressed to BFS's Philadelphia facility.

Starting by June 2023, Irby and co-defendants Cory Scott and Alexander Telewoda conspired to steal Treasury checks from the Philadelphia mail processing center and then resell those checks via the instant messaging application Telegram to purchasers around the country. To facilitate the scheme, Irby identified mail sorting machines which, at certain times of the day, processed large numbers of envelopes containing Treasury checks that had been marked "Return to Sender" and were being returned to BFS's Philadelphia facility. During his shifts, Irby stole bulk quantities of envelopes containing Treasury checks (sometimes hundreds at a time) from the mail bins to which those envelopes had been sorted. Without opening the envelopes, Irby concealed them in a sweatshirt or jacket pocket, or in a backpack. When Irby stole checks, he communicated with Scott and Telewoda, advising them that he had obtained more checks. Irby then arranged to meet with Scott and/or Telewoda following his shift, and Irby provided them with the stolen Treasury checks in sealed envelopes, in exchange for payment. Scott and Telewoda then advertised the stolen checks on Telegram, sold them to other Telegram users (typically for 10% of their face value), and mailed the checks to those purchasers who then attempted to negotiate the stolen checks at financial institutions.

In August 2023, Irby and Scott exchanged messages via Telegram discussing how to get co-defendant Tauheed Tucker—Irby's cousin, who also worked as a Mail Processing Clerk at the Philadelphia mail processing center—involved in the Treasury check theft scheme. In the days that followed, Irby and Tucker exchanged Telegram messages discussing how to steal checks from certain mail processing machines within the mail processing center and Tucker began stealing Treasury checks for Scott and Telewoda during his own shifts. Irby continued to meet with Scott and Telewoda in person to exchange Treasury checks for payment through at least August 2024.

Irby, however, did not sell only to Scott and Telewoda. Irby sold an additional 112 Treasury checks—with a total face value of nearly $250,000—to another individual on August 7, 2024; Irby had stolen those checks during his shift at the mail processing center a few days earlier. That sale, which transpired in the parking lot of Rivers Casino in Philadelphia, was captured on surveillance video.

Irby and Tucker were terminated by USPS on or about September 11, 2024, thereby eliminating their access to Treasury checks passing through the mail processing center. In total, Irby received payments of at least $72,510 arising from his theft of Treasury checks. The total face value of Treasury checks tied to the conspiracy[3] exceeded $84 million; those checks were either recovered from Scott and Telewoda personally or were posted for sale to Scott's and Telewoda's respective Telegram channels throughout the course of the conspiracy. Their purchasers attempted to fraudulently cash thousands of those Treasury checks at financial institutions, and the government ultimately paid out approximately $11 million to those individuals, which it was unable to recover.

[3] This total does not include the $250,000 in Treasury checks that Irby sold to another individual, as referenced above and charged in Count Four of the superseding indictment.

## III. SENTENCING CALCULATION

### A. Statutory Maximum Sentences

The statutory maximum penalty for Count One, charging conspiracy to steal government funds, is a term of imprisonment of 5 years, a term of supervised release of 3 years, a fine of $250,000, and a special assessment of $100; for Count Two, charging theft of government funds (and aiding and abetting), a term of imprisonment of 10 years, a term of supervised release of 3 years, a fine of $250,000, and a special assessment of $100; and for each of Counts Three and Four, charging mail theft (and, in Count Three, aiding and abetting), a term of imprisonment of 5 years, a term of supervised release of 3 years, a fine of $250,000, and a special assessment of $100.

Thus, the total permissible statutory maximum sentence is a term of imprisonment of 25 years, a term of supervised release of 3 years, a fine of $1,000,000, and a special assessment of $400. Full restitution of as much as $11,055,414.25 shall be ordered, and forfeiture of $72,510 also may be ordered.

### B. Sentencing Guidelines Calculation

The U.S. Probation Office has concluded that Irby's total advisory guideline range is 63 to 78 months' imprisonment, given an offense level of 26 and a criminal history category of I. *See* Presentence Investigation Report ("PSR") ¶ 104. The government agrees with this calculation, and the defense has not submitted any objections.

#### 1. Offense Level Calculation

The Probation Office has correctly calculated Irby's offense level as follows:

| | |
|---|---|
| Base offense level<br>(§ 2B1.1(a)(2)) | 6 |

| | |
|---|---|
| Intended loss between $65 million and $150 million (§ 2X1.1(a), § 2B1.1(b)(1)(M)) | +24 |
| Offense involved 10 or more victims (§ 2B1.1(b)(2)(A)) | +2 |
| Reduction for conspiracy (§ 2X1.1(b)(2)) | -3 |
| Abuse of position of trust (§ 3B1.3) | +2 |
| Zero-Point Offender (§ 4C1.1) | -2 |
| Timely acceptance of responsibility (§ 3E1.1(a), (b)) | -3 |
| **Total:** | **26** |

PSR ¶¶ 40–49.

2. Criminal History Calculation

Irby has no criminal history, which results in a criminal history score of zero. PSR ¶ 52. With no criminal history points, Irby is in criminal history category I. *Id.* As noted above, Irby also received a reduction of two offense levels given his lack of prior convictions. *Id.* ¶ 46.

Given a total offense level of 26 and a criminal history category of I, Irby's guideline range is 63 to 78 months' incarceration. *Id.* ¶ 104.

## IV. ANALYSIS OF STATUTORY FACTORS

The Supreme Court has declared that "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). This Court must also consider all of the sentencing factors set forth in 18 U.S.C. § 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a). Pursuant to Paragraph 3 of the parties' plea agreement, the government and the defendant have agreed that a sentence of 63 to 70 months' incarceration is an appropriate disposition of this case. For the reasons set forth below, the government submits that a sentence of 70 months' imprisonment—at the top of that agreed-upon range and squarely in the middle of the applicable sentencing guideline range—is fully supported by each of the § 3553(a) factors.

### A. The Nature and Circumstances of the Offense

Irby's offenses were very serious. He played an integral role in a long-running conspiracy to steal thousands of U.S. Treasury checks—worth tens of millions of dollars—from a USPS facility and resell them to opportunists ready to try their luck cashing in on government payments intended for others. Irby was one of only two individuals (the second of whom he

recruited) who made this crime possible: without Irby's access to Treasury checks passing through the mail processing center—a secure facility accessible only to Postal employees—this crime could not have occurred. Irby was arguably the most essential participant in this conspiracy. In fact, his participation was so critical that the scheme crumbled when Irby (and Tucker) were fired from USPS because their termination deprived co-conspirators Scott and Telewoda of their unlimited supply of stolen checks. Moreover, while Irby primarily did business with Scott and Telewoda, they were not his only customers: Irby has admitted to selling stolen checks to at least one other buyer.

The total face value of the stolen checks at issue is staggering: Irby has been tied to more than $84 million in intended loss. Although not all of these checks were negotiated at banks, each and every one of them was stolen from the mail by Irby or Tucker, resold by Irby or Tucker to a co-conspirator, and—most importantly—diverted from its true intended recipient.

As a result of the defendants' conduct, thousands of individuals who were counting on government payments were left empty-handed for months or even years. These victims are hardworking Americans who, in many cases, desperately needed these government funds. Many of the stolen Treasury checks represented social security and veterans benefit payments, as well as income tax refunds—payments on which ordinary individuals rely to meet their daily living expenses. In other cases, the stolen Treasury checks represented substantial payments designed to help businesses stay afloat and keep employees on their payroll during the COVID-19 pandemic. In one instance, Irby and his co-conspirators stole three checks totaling more than $400,000 from a single victim. PSR ¶ 29 (victim J.B.).

Although victims could contact the government to request that their missing checks be reissued, that was not a straightforward process, especially where their checks had already been

fraudulently cashed by an impersonator. As several victims explained to the Probation Office, the process of having their stolen checks reissued was a lengthy and arduous one. One victim reported waiting two years for a replacement check. *Id.* ¶ 32 (victim S.C.). Where businesses and individuals were counting on large payments that didn't arrive as expected, some even had to take out high-interest loans or delay payment of other expenses while waiting for replacement checks. *Id.* ¶¶ 29 (victim S.C. was unable to timely pay off a line of credit); 34 (victim J.B. remortgaged his home to keep his business operating when his pandemic relief payments did not arrive as scheduled). In some cases, victims are still waiting for their checks to be reissued. *Id.* ¶ 29 (victim D.N.). These victims reported being "embarrassed by the situation," *id.* ¶ 31, suffering "fear, stress, anxiety, frustration, and uncertainty," *id.* ¶ 34, and losing all faith in the U.S. postal system, *id.* ¶ 31.

Beyond the individuals who personally suffered at the hands of Irby and his co-conspirators, the government was deceived into paying out nearly $11 million in taxpayer funds to undeserving fraudsters as a result of the defendants' crimes. Ultimately, crimes like Irby's undermine public confidence in the reliability and smooth operation of government programs generally, and in the integrity and dependability of the U.S. mail specifically. Irby's abuse of the trusted access that he had to these Treasury checks made a mockery of the U.S. postal system. Given the brazenness of these crimes and the sheer number of stolen checks involved, a sentence of 70 months' incarceration is fully justified here.

### B. The History and Characteristics of the Defendant

Irby's personal history also supports a substantial sentence of 70 months' imprisonment. While Irby has no criminal history, that fact is already accounted for in both his offense level and

criminal history category calculation, thereby lowering his applicable sentencing guideline range. PSR ¶¶ 46, 52.

Moreover, Irby has made minimal effort to be a productive member of society over the past several years. He dropped out of community college after a single semester, *id.* ¶ 82, and has had a spotty employment record since that time, instead relying on his mother and the mother of his son for financial support, *id.* ¶¶ 86-95. His most stable job was working for USPS, *id.* ¶ 90, during which time he routinely stole from his employer, leading to the instant charges. He also admitted to regular marijuana use until his arrest in this case, *id.* ¶ 77, and has a serious gambling problem that has occupied much of his time and has persisted during his supervision by Pretrial Services, *id.* ¶ 76. This conduct highlights a refusal to take the law and his responsibilities as a young adult seriously and counsels in favor of a lengthy prison sentence.

**C. The Need for Adequate Deterrence**

In fashioning the appropriate sentence, the Court should account for both specific and general deterrence. As to specific deterrence, a sentence of 70 months—which is necessary in light of the seriousness of Irby's crimes—should be sufficient to deter him from the commission of further offenses. This will be Irby's first sentence of imprisonment and should effectively send a message that high-dollar financial crimes will be met with the most serious of consequences.

General deterrence is also particularly important in this case. Fraud schemes utilizing checks stolen from the mail are a widespread and dire problem not only in the Eastern District of Pennsylvania, but throughout the country. The misconduct has resulted in a loss of trust in the Postal Service and has even led to guidance that Americans should no longer send checks through the mail due to the serious risk of check fraud. *See, e.g.*, Ann Carrns, *Don't Send Checks Through the Mail. Just Don't*, N.Y. Times (June 26, 2026), https://www.nytimes.com/

2026/06/26/your-money/paper-checks-mail-fraud.html (comment by the director of financial services for the Consumer Federation of America that "[n]o one should ever mail a check"). Thus, a significant sentence is critical in this case to send a message that this conduct will not be tolerated.

**D. The Need to Avoid Unwarranted Sentencing Disparities**

Four defendants have been charged in connection with this scheme, and it is therefore imperative that Irby be sentenced in accordance with his relative culpability. Although only one defendant—Alexander Telewoda—has been sentenced as of the date of this submission, the PSR for every defendant has now been finalized. Irby and Cory Scott face the same guideline range of 63 to 78 months and the government is recommending the same sentence of 70 months' incarceration for both defendants. On the one hand, Irby could be viewed as the more culpable of the two defendants, given how essential the access he enjoyed as a Postal employee to an unlimited supply of Treasury checks was to the success of the crime. However, Scott (and Telewoda) dedicated far more time to the scheme than Irby did, essentially treating purchasing, advertising, and shipping stolen checks to buyers as a full-time job. Irby, by contrast, took just a few minutes out of his Postal shifts to swipe Treasury checks from specific mail sorting machines and then briefly met with Scott and Telewoda following his shifts to hand off the checks. Scott also profited the most from the scheme, collecting almost $300,000 in payments from customers who bought his stolen checks, as compared to Irby's profits of approximately $75,000.

Alexander Telewoda faced slightly higher guidelines of 70 to 87 months, a distinction supported both by Telewoda's higher criminal history category (II) and by the large number of stolen Treasury checks that Telewoda continued to purchase (from an unidentified source) after

Irby and Tucker were terminated by USPS. This Court sentenced Telewoda to the government's recommended sentence of 78 months' imprisonment, PSR 2—a term that fell in the middle of Telewoda's applicable guideline range. The government now recommends that Irby (and Scott) be sentenced in precisely the same manner: in the middle of their own advisory guideline range.[4]

For these reasons, a sentence of 70 months' imprisonment is fully justified and is not inconsistent with the sentences the government recommends for Irby's co-conspirators.

## V. RESTITUTION

The government respectfully requests that the Court order Irby to pay restitution in the amount of $10,841,731.83, which represents the total losses to various government agencies that honored stolen checks fraudulently cashed by Scott's and Telewoda's purchasers.[5] The entire restitution figure is tied to checks issued during the course of the conspiracy. For this reason, the full restitution amount shall be joint and several among the co-conspirators.

## VI. SUPERVISED RELEASE

Pursuant to Sections 5D1.1 and 5D1.2 of the Sentencing Guidelines, as amended effective November 1, 2025, the Court is directed to conduct an "individualized assessment" when deciding whether to impose a term of supervised release, and if supervised release is imposed, how long the term should be. The Court is further directed to state in open court its

---

[4] According to his PSR, co-defendant Tauheed Tucker—who was a member of the conspiracy for a shorter period of time than his three co-defendants—is, appropriately, facing a lower guideline range of 51 to 63 months' incarceration. For the reasons set forth in Mr. Tucker's sentencing memorandum, the government is recommending a sentence for Mr. Tucker at the low end of his guideline range.

[5] Paragraph 6 of the parties' plea agreement references restitution of up to $11,055,414.25. The government, however, recently received updated figures from BFS that differ slightly from the previous calculation, which the government suspects is due in part to the government having successfully clawed back certain payouts to undeserving individuals.

reasons for imposing or not imposing a term of supervised release, and its reasons for the length of a term imposed. Further, § 5D1.3 sets forth mandatory conditions of a term of supervised release, and "discretionary conditions" that the Court may impose, following the same individualized assessment.

The guideline commentary, consistent with 18 U.S.C. § 3583(c), provides that the "individualized assessment" should rest on consideration of the same sentencing factors under 18 U.S.C. § 3553(a) that are considered with respect to a term of imprisonment, with the exception of §§ 3553(a)(2)(A) (the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense") and 3553(a)(3) ("the kinds of sentences available"), which do not apply with regard to supervised release decisions.

In this case, a three-year term of supervised release is warranted. Given Irby's well-documented gambling addiction that has persisted long after his arrest in this case, PSR ¶ 76, close supervision following his release from imprisonment is warranted to ensure that he receives and follows through with the appropriate treatment for that addiction, pursuant to § 3553(a)(2)(D). Supervision is also essential to ensure that Irby makes payments toward his nearly $11 million restitution obligation upon his release from custody, in accordance with § 3553(a)(7).

## VII. CONCLUSION

For the reasons set forth above, subject to any representations in the Sealed Supplement, the government respectfully requests that the Court impose a sentence of 70 months' incarceration, as well as a three-year period of supervised release. The government further requests that Irby be required to pay restitution, joint and several with his co-defendants, in the amount of $10,841,731.83.

Respectfully submitted,

DAVID METCALF
United States Attorney

*/s/ Jessica Rice*
JESSICA RICE
Assistant United States Attorney

Dated: October 12, 2026

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the Government's Sentencing Memorandum has been served by electronic filing (ECF) upon the following:

Jesse Smith, Esq.
Jesse_Smith@fd.org
*Counsel for Defendant Saahir Irby*

*/s/Jessica Rice*
JESSICA RICE
Assistant United States Attorney

Dated: October 12, 2026